**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**BRIAN McMULLIN AND DAWN**
**McMULLIN, individually; and DAWN**
**McMULLIN, as Special Personal Representative**
**of the Estate of Garret Lee McMullin, Deceased**                    **PLAINTIFFS**

**v.**                              **CASE NO. 3:06-CV-00172 GTE**

**UNITED STATES OF AMERICA**                                    **DEFENDANT**

**SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

At the conclusion of the trial the Court made certain findings of fact and stated certain

conclusions of law.  Those findings and conclusions remain in effect unless changed or modified

by the following supplementary findings and conclusions:

**I.      FINDINGS OF FACT:**

1.      Garret McMullin was a child born with anatomic heart defects which required two

shunt surgeries to properly fix the congenitally altered anatomy of his heart which was not

capable, at birth, of properly pumping blood to his lungs.  The first surgery was performed at age

one week; the second at age thirteen months.  A third surgery was also contemplated to deal with

this problem.  Garret's congenital heart defects and the corrective surgeries required to

ameliorate same placed him at a much increased risk of bacterial endocarditis than the general

pediatric population – a circumstance well known by pediatricians.  It was also well known to

pediatricians that undiagnosed and untreated infective endocarditis can be fatal in a matter of

days or weeks.

2.      Dr. Buxton was made aware of the details of Garret McMullin's significant

medical history through the Heart Book presented to him by Dawn McMullin.  Dr. Buxton

agreed  to be Garret's primary care physician and to keep in touch with Arkansas Children's

Hospital as needed.

3.      On February 4, 2002, Garret McMullin was seen by Dr. Buxton with one day of

nausea and vomiting and fever to 100.3 degrees for two days.  Dr. Buxton did not order any

laboratory testing or antibiotics, opining that Garret was suffering from a gastrointestinal virus.

4.      Dawn McMullin made telephone calls on February 6, 2002, or February

8, 2002, or both, to Dr. Buxton's office nursing staff.  The substance of those conversations was

as Dawn McMullin described in her testimony.

.      5.      On February 8, 2002, the nurse made an appointment for Dawn McMullin to

bring Garret in to see Dr. Buxton on February 11, 2002.

6.      On February 11, 2002, Garret McMullin was again seen by Dr. Buxton.  No blood

work or other laboratory testing was done or ordered by Dr. Buxton.

7.       On February 14, 2002, Dawn McMullin contacted Dr. Buxton's office staff

seeking to come in for further evaluation and treatment for her very ill son, but was told by the

nurse that it was not necessary.

8.      On February 17, 2002, Garret McMullin was taken to the emergency room at

Randolph County Medical Center, the staff of which concluded that he was in serious condition

and should be immediately transferred by ambulance to Arkansas Children's Hospital.  He

arrived at Arkansas Children's Hospital in the early morning hours of February 18, 2002, and

was promptly examined, tested and evaluated.

9.      On February 19, 2002, a large vegetative growing on the tricuspid valve of the

2

heart was removed by open heart surgery.  This vegetation threw off infective emboli into the blood stream some of which lodged in the middle cerebral artery causing a mycotic aneurysm which was discovered by a CT scan of the brain.

10.     On February 20, 2002, Garret McMullin regained consciousness after surgery and appeared to be recovering nicely.  Later in the day the mycotic aneurysm began to bleed and Garret suffered a seizure and lost consciousness.  He never recovered consciousness.

11.     The early morning of February 25, 2002, the aneurysm ruptured causing massive cerebral bleeding.  Upon medical advice, the decision was made to remove life support.   Garret McMullin died in the arms of his grandmother.

12.     The parties have stipulated that the medical bills amount to $102,193.85.  The parties have also stipulated that the amount billed by Medicaid was $19,045.92

## II.     STANDARD OF CARE IN ARKANSAS

The Court finds that the standard of care in this case would have required Dr. Buxton, when presented with a child with the history and medical condition of Garret McMullin, to order laboratory tests, including a blood culture, at least by the time of the visit on February 11, 2002.  The blood culture, among other testing, would have indicated endocarditis, whereupon, Dr. Buxton should have promptly transferred Garret to Arkansas Children's Hospital.  After comparing the clinical notes dated February 4th and 11th, the Court finds that on February 11th, Dr. Buxton had no credible basis for finding that the child was "getting better."  Garret's fever had worsened (even with Tylenol), his respiratory rate and pulse had increased, and he had developed redness in his throat.  There was no justification for not ordering lab work, particularly a blood culture.  Furthermore, the Court finds that the standard of care would have required Dr. Buxton's

3

office nurse to instruct Dawn McMullin to bring Garret McMullin in to see Dr. Buxton when she called the office on either February 6th or 8th describing Garret's symptoms and condition.

The Court credits the testimony of Dr. Shore as to the standard of care. Indeed, Defendant offered no expert or other opinion challenging this standard. Dr. Shore testified that if the phone calls on February 6th and 8th took place, as the Plaintiffs describe, there was a violation of the standard of care. Additionally, Dr. Shore testified that Dr. Buxton's actions on February 11, 2002, fell below both the acceptable national standard of care, and the acceptable standard of care in Pocahontas, Arkansas, as applied to a child presenting with the medical history and condition of Garret McMullin.

## III.    CAUSATION

The Court finds that Dr. Buxton's failure to perform to the appropriate standard of care constituted medical malpractice and was a proximate cause of the death of Garret McMullin. Dr. Shore testified that Dr. Buxton's medical malpractice caused the death of Garret McMullin. Dr. Shore also testified that had proper therapy been commenced even as late as February 11th and continued through the 13th, Garret McMullin would more likely than not recovered. The Court agrees.

## IV.    DAMAGES

### The Wrongful Death Claims

The Defendant argues that the Arkansas Medical Malpractice Act prevents Garret's parents, the Plaintiffs here, from recovering the benefits ordinarily available under Arkansas' Wrongful Death Statute. More particularly Defendant argues:

Arkansas' Medical Malpractice Act provides for compensation for the decedent. It

does not provide compensation for others who suffered loss as a result of any
death which resulted from the malpractice. Plaintiffs allege losses under the
Wrongful Death Statute for their pain and suffering resulting from defendant's
violation of the Arkansas Medical Malpractice Act. The Medical Malpractice Act
makes no provision for recovery for any party other than the party injured as a result of the malpractice. T
precluded from receiving any damages for their suffering.

In <u>Davis v. Parham</u>, 362 Ark. 352, 361-362, 208 S.W.3d 162, 168 (2005)[,] the
Arkansas Supreme Court reiterated earlier cases which, in the context of resolving
statute of limitations issues, addressed a basic principle regarding the interplay
between the Medical Malpractice Act and the Wrongful Death Act. The Court,
quoting an earlier case, stated:

> "Furthermore, we stated in *Scarlett*, *supra*:
>
> We recognized in *Ruffins* that the Medical Malpractice Act was
> enacted long after the wrongful death statute was enacted, and that
> it expressly states that it applies to all causes of action for medical
> injury and that it supersedes any inconsistent provision of law. We
> have consistently applied this reasoning in the cases following
> *Ruffins*. We adhere to this position, and decline to overrule these
> cases.
>
> *Scarlett*, 328 Ark. At 675, 944 S.W.2d at 547."

Defendant recognizes that the issue [of] whether the damages provision of the
Medical Malpractice Act vitiates the Wrongful Death Statute has been presented
to various circuit courts in Arkansas and to federal district courts in Arkansas.
Rulings in the Arkansas circuit courts have been inconsistent.  The Arkansas
Supreme Court has not ruled on the issue.

Defendants' Brief, pp. 3-4.

The Court agrees that there has been some inconsistency in the rulings of the state circuit

courts on this issue.  However, as noted by Plaintiffs, federal district court decisions in both the

Eastern and Western Districts are in agreement in squarely holding that damages recoverable by

beneficiaries under the Wrongful Death Act are <u>not</u> "inconsistent" with the Medical Malpractice

Act which has been held to supercede only  "any inconsistent provision of law."  *See* Judge Bill

Wilson's decision in *Meredith v. Buchanan*, 101 F. Supp. 2d 764 (E.D. Ark. 2000) and Judge

Franklin Waters' decision in *Foncannon v. Phico Insurance Co.*, 104 F. Supp. 2d 1091 (W.D.

Ark. 2000).

The Court agrees with Judge Wilson's statement in *Meredith* that, "Repeal by implication

is not a favored device in our interpretation of statutes . . ." and with his holding in that case:

> The Court is persuaded beyond per adventure that none of those involved in the
> enactment of the Medical Malpractice Act ever had any notion that it would
> deprive widows, widowers, and orphans of their claims under the Wrongful Death
> Act. Once one reaches this conclusion, the question becomes whether the General
> Assembly repealed those damages in such clear language that we cannot look to
> other precedent, or rely upon common sense, to determine legislative intent-or,
> more precisely, lack of intent. This Court doesn't think so.

> This Court believes that the Arkansas Supreme Court would find that the damage
> provisions of the Medical Malpractice Act and the Wrongful Death Act damages
> for beneficiaries are consistent and complementary. Therefore, Defendants'
> motions for partial summary judgment denied.

101 F. Supp.2d at 769.

Judge Waters agreed with the conclusion reached by Judge Wilson "in his lucid and well-

reasoned opinion." *Foncannon*, 104 F. Supp. 2d at 1096 n.4. He also noted the Arkansas

Supreme Court's decision in *HCA Health Services of Midwest, Inc. v. National Bank of

Commerce,* 294 Ark. 525, 745 S.W. 2d 120 (1998) which dismissed a similar argument that,

because of the Medical Malpractice Act, punitive damages should not be recoverable since such

damages are not included in the damages section of that Act. *Foncannon*, 104 F. Supp. 2d at

1096. Judge Waters further observed:

> As plaintiffs accurately point out, adopting defendants' argument would produce
> truly absurd results. The Arkansas Wrongful Death Act would allow recovery of
> damages by the specified beneficiaries in all cases of wrongful death except those
> involved a wrongful death resulting from a medical injury.

We cannot imagine that the legislature would intend such absurd results or that the Arkansas courts would construe the Medical Malpractice Act to produce such results . . .

*Id.*

This Court agrees with Plaintiff's observation that "at no time has the Arkansas Supreme Court hinted, surmised or concluded that wrongful death benefits are not recoverable in a medical malpractice action." More importantly this Court predicts that when it is eventually presented with the issue, the Arkansas Supreme Court will agree with Judges Wilson and Waters. Therefore the Court will, under the Arkansas Wrongful Death Statute, assess and award to Garret's parents the damages sustained as a proximate result of his wrongful death.

## The Survival Statute Claims

At common law the death of a person abated any cause of action that that person might have pursued had he/she survived. The Arkansas Survival Statute, Ark. Code Ann. § 16-62-101, *et seq.*, reversed that result. Now, the personal representative of the deceased claimant is entitled to recover on behalf of the decedent's estate certain damages. In this case, Dawn McMullin as Garret's personal representative is entitled to recover the reasonable value of the necessary medical services supplied to or on behalf of Garret from February 8, 2002, until his death. The Court has previously ruled in a separate opinion that the estate, if it prevailed, would be entitled to the value of such services in the amount of $102,193.85 rather than the amount actually paid by Medicaid. The estate is also entitled to an award for the funeral expenses in the amount of $1,480.35 and $1,230.86 for a grave marker. In addition, Garret's estate is entitled to recover for the conscious pain and suffering and mental anguish suffered by Garret prior to his death,

together with damages for the value of the life of Garret, referred to in the statute as "loss-of-life" damages.

The evidence sustains an award of only a modest amount for the pain and suffering and mental anguish of Garret resulting from Defendant's malpractice. It is true that he had to undergo an unnecessary heart operation, but there is no evidence that the operation itself occasioned conscious pain and suffering.  We are dealing with a period from February 14 until February 20. On February 17, Garret was taken to the Emergency Room in Pocahontas because he appeared to be "lifeless" and lethargic.  He had a moderately high temperature.  Clearly, he was a sick child, but he probably suffered no more than a child with severe flu symptoms before arriving at Arkansas Children's Hospital in Little Rock in the early morning hours of February 18.  After Garret's surgery on February 19, he was extubated on the morning of February 20.  From 8:00 a.m. until 3:00 p.m. that afternoon he appeared to be recovering well from the operation.  Then, the mycotic aneurysm bled and later ruptured leading to his loss of consciousness on February 20 and then to his death on February 25, 2002.

The Court will award the estate $10,000.00 for Garett's conscious pain and suffering and mental anguish experienced prior to his death.

The most serious and difficult factual and legal damage issue with which the Court must deal arises out of the necessity for understanding and applying the "loss of life" element of damage created by the Arkansas Legislature (General Assembly) in 2001.

In 2001, Arkansas' Survival Statute was amended to state:

In addition to all other elements of damages provided by law, a decedent's estate may recover for the decedent's loss of life as an independent element of damage.

*See* Ark. Code Ann. § 16-62-101(b).

The parties agree that Garrett's estate is entitled to recover for this relatively new element

of damage, but they do not agree on its proper interpretation.

Only one Arkansas Supreme Court decision discusses the meaning of the new element.

*See Durham v. Marberry,* 356 Ark. 481, 492, 156 S.W.3d 242, 248 (2004), where it is stated:

> Loss-of-life damages seek to compensate a decedent for the loss of the value that
> the decedent would have placed on his or her own life. "Survival" actions have
> traditionally included those damages suffered by the decedent between injury and
> death. Nonetheless, Ark. Code Ann. § 16-62-101 makes no distinction between
> "personal injury" or "death" when it speaks of the term "injury." In other words,
> when a person is killed instantaneously, as was Miss Durham, her injury *is* her
> death, which is compensated by loss-of-life damages.
>
> In sum, because the legislature chose to amend the survival statute to add loss-of-
> life damages as a separate and independent element in addition to all other
> elements of damage already allowed by law, the appellants are correct that loss-of-
> life damages are a new element of damages. Moreover, because the phrase "loss
> of life damages" as used by the legislature in § 16-62-101(b) is clear and
> unambiguous, and, since loss-of-life damages can only begin accruing at the point
> when life is lost, at death, there is no reason to believe the legislature intended to
> require the decedent to live for a period of time between injury and death.
> Therefore, we hold that it is not necessary for a decedent to live for a period of
> time between injury and death in order to recover loss-of-life damages under Ark.
> Code Ann. § 16-62-101(b).

After noting the Arkansas Supreme Court's ruling in *Durham* that "loss of life damages

seek to compensate the decedent for the loss of the value that the decedent would have placed on

his or her own life," the Defendant states that it is at a loss to understand how such a standard

might rationally be applied:

> "A saint will opine that his life is worth nothing while a sinner asserts that his life
> is invaluable. The Arkansas Supreme Court has not been of much assistance in
> providing guidance on application of this statute to real world facts."

Defendant's Brief, p. 7.

9

So, do we have here a metaphysical, standardless damage element which should be deemed suspect for vagueness?[1]

In jury trials we regularly instruct: "When making your factual findings you must not engage in guesswork or speculation."  And yet the Arkansas Supreme Court's decisions and the AMI instructions recognize that occasionally some degree of  conjecture is permitted.  *See*, for instance, the case of *St. Louis Southwestern Ry Co. v. Pennington*, 261 Ark. 650, 553 S.W.2d 436 (1977):

> ... difficulty in measuring damage of this sort [mental anguish] should not preclude recovery and that the amount to be awarded rests in the discretion of the jury, subject to review as in other cases.  Apparently in *Norman*, we recognized that some degree of conjecture by a jury is permissible in wrongful death cases where an element of damage is incapable of definite calculation.

The Arkansas Model Jury Instructions (AMI) simply identifies as an element of damages that the administrator of the decedent's estate may recover "[t]he decedent's loss of life."  *See* AMI 2216.  The only pertinent comment states:

> As a result of a 2001 amendment to Ark. Code Ann. §16-62-101, damages for the decedent's "loss of life" are now recoverable by the estate as an independent element of damage.  These are the damages that would compensate a decedent for

---

[1]  Apparently a claim of unconstitutional vagueness was raised by appellees in *Durham* but later abandoned, to wit:

> In the hearing below, the appellees contended that the appellants' interpretation of § 16-62-101(b), if held to be the correct interpretation, would result in an unconstitutional provision for a punitive penalty without due process and would render the statute unconstitutionally vague.  On appeal, the appellees limit their constitutional argument to one sentence: "The Circuit Court did not hold the statute unconstitutional, and [the appellees] make no argument that the statute is unconstitutional, if read correctly."  The appellees have abandoned their constitutional argument on appeal; therefore, we do not address it.

356 Ark. at 485, 156 S.W.3d at 244.

10

the loss of the value that a decedent would have placed on his or her own life.
*Durham v. Marberry*, 356 Ark. 481, 156 S.W.3d 242 (2004).

*See* AMI 2216 cmt.

The Court has found two United States District Court cases dealing with the interpretation of Arkansas Code Annotated § 16-62-101(b), which added the damage claim for "loss of life."  Both arose under the Federal Tort Claims Act.  In the case of *Cecil Bennett, et al vs. United States*, Case No. 4:04CV0007, Judge Leon Holmes after finding the Government liable, was called upon to determine the amount of damages to award.  He stated:

> The principal issues to be decided by the Court relate to damages, especially damages for loss of life, loss of companionship, and mental anguish.  Determining the amounts to award for such damages is inherently difficult because of the incommensurability of money and such losses.

In that case, Mary Maxine Bennett died instantly in the automobile accident caused by the negligence of the driver of the military pickup truck operated by the United States Army.  She was seventy-five years of age and in good health at the time of her death.  According to Judge Holmes, her life expectancy was approximately eleven or twelve years.  Judge Holmes was called upon to fix the damages for the loss of Mrs. Bennett's life.  Again, he noted that the value of her life "is not something that can be measured in dollars and cents because the worth of a human life is incommensurate with money; yet, the Court has an obligation to fix an amount that will fairly and reasonably compensate the Estate of Mary Maxine Bennet for the loss of her life."  Judge Holmes found that the sum of $400,000 would be that "fair and reasonable amount."

In the case of *Citizens Bank of Batesville, vs. United States of America*, Case No. 1:01CV00104, Judge James Moody held "[t]hat the Arkansas Wrongful Death Act, as amended .

11

. . to allow a decedent's estate to recover for 'the decedents' loss of life as an independent element of damages,'" applied in his case.

In the *Citizens Bank* case, Judge Moody permitted the testimony of Dr. Smith, an expert witness on the issue of hedonic damages, or loss of life.  However, although he did not reject such testimony entirely under *Daubert*, he stated that he did "not find it persuasive."

Judge Moody was dealing with the death of two elderly persons, William and Roma Pearrow.  He observed:

> There is no dispute that both William and Roma Pearrow were fine people who were energetic, caring and continued to provide parental support for all their siblings and progeny.  It is also clear that both Pearrows had a zest for life that belied their advanced years.  The Court must recognize the realities of the aging process and the toll it takes on quality of life and has fixed damages for loss of life under Ark. Code Ann. § 16-62-101[(b)], taking into consideration Dr. Smith's opinions and the other evidence in the record.

Without any further discussion of the evidence he concluded that the two estates were entitled to the following awards:

| | |
|---|---|
| Estate of Roma Pearrow | $81,068.91 |
| Estate of William C. Pearrow | $71,463.91 |

In the case before the Court we are dealing with a person who died at the age of seventeen months.  The *Bennett* and *Citizens Bank* cases would therefore appear to offer little guidance. The Court has also looked at the legal literature on the subject.

Ms. Ali M. Brady wrote a case note on the *Durham* case published at 59 Ark. L. Rev. 125 (2006) (footnotes omitted), the first three paragraphs of which state:

> In *Durham v. Marberry*, The Arkansas Supreme Court interpreted the Arkansas survival statute as allowing recovery for a decedent's loss of life as an independent element of damages.  In so doing, the court placed Arkansas in the

minority of jurisdictions that allow recovery of hedonic damages incurred after death.  Although the Arkansas Supreme Court did not directly rule on how loss-of-life damages are to be measured, the court expressed a preference for an individualized, subjective measure by stating that loss-of-life damages should "compensate a decedent for the loss of the value that the decedent would have placed on his or her own life."

The Arkansas Supreme Court's decision in *Durham* left open the question of how loss-of-life damages should be measured.  Two approaches have emerged among the other jurisdictions that recognize loss-of-life damages.  It appears that many states allow plaintiffs to demonstrate the actual loss to the decedent by presenting the same evidence that would be admissible in personal injury cases where damages are sought for loss of enjoyment of life's activities as a result of a permanent disability.  Fewer states seem to allow plaintiffs to present the expert testimony of scientists, economists, and psychologists to establish the statistical value of the average human life.  A third approach, suggested by the Arkansas Supreme Court in *Durham*, would allow the plaintiff to put on evidence of the value that the decedent placed on his or her own life.  This approach is not currently followed by any other jurisdiction.

This note explains why Arkansas courts should adopt the majority approach, which allows the jury to use their own judgment and life experiences to determine the unique value of the life lost.  The majority approach accurately and objectively compensates the value of a decedent's unique life, particularly when compared to the other approaches that base recovery on a statistically average human life or the decedent's own subjective evaluation.  This note also explains how expert testimony necessary for the minority approach is based on questionable science, which does not withstand the test laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc. ("Daubert* Test*")* as adopted in Arkansas.

The law review note continues:

The 2001 Arkansas General Assembly added a new subsection to the Arkansas survival statute, which states: "In addition to all other elements of damages provided by law, the decedent's estate may recover for the decedent's loss of life as an independent element of damages."  Although there are indications that the purpose of the Act was to create a category of damages that would be recoverable specifically by the estate of a viable fetus, the Model Jury Instructions were modified to include recovery for loss of life in general.  The new instruction lists the "decedent's loss of life" as a element of damages separate from damages for "[c]onscious pain and suffering."  The instruction provides definitions for terms such as "mental anguish" and "consortium," but do[es] not explain the meaning of

"loss of life."  It was against this backdrop that the Arkansas Supreme decided *Durham v. Marberry* on March 25, 2004.

Ali M. Brady, Note, *The Measure of Life: Determining the Value of Lost Years after* Durham v. Marberry, 59 Ark. L. Rev. 125, 131-32 (2006) (footnotes omitted).

It appears that only Connecticut, Hawaii, New Hampshire, New Mexico and Arkansas allow for the recovery by the decedent's estate of loss-of-life damages incurred after death.  *Id*. at 125 n.4.  The Arkansas Law Review note analyzes various methods of proving and measuring such damages and explains why the author believes that Arkansas should adopt the Connecticut approach.  *Id*. at 142-45.  First, it is recognized that the Arkansas Supreme Court's *Durham* opinion appears to adopt a purely subjective standard.  That approach is then criticized as follows:

> The Arkansas Supreme Court suggested how it would measure loss-of-life damages when it stated in *Durham* that these "damages seek to compensate a decedent for the loss of the value that the decedent would have placed on his or her own life."  As the basis for establishing the amount of loss-of-life damages, the court would likely look to testimonial evidence that could include statements made or actions taken by the decedent tending to prove the subjective value he placed on his own life.  Using the facts of *Durham* as an example, the court would expect that the value of Amanda's loss of life be measured individually, as opposed to a measure based on the value of a statistically average life, and subjectively, meaning that it would be based on Amanda's own perception of the value of her life rather than an objective evaluation.  To date, this approach has not been adopted by any other jurisdiction.

> * * *.

> The purely subjective approach that the court alluded to in *Durham* fails to recognize that society and the law place an objective value on an individual's life apart from what that individual believes his or her life to be worth.  For example, society views certain types of behavior, such as charitable work, as more valuable than other types, such as lying or stealing.  Arkansas has laws designed to reduce drug use and suicide, which are aimed at protecting the lives of people who do not value their own lives enough to protect themselves.  Conversely, Arkansas law

14

allows the death penalty in certain cases. While the individual sentenced to death conceivably believes that this life is valuable, society and the law have determined his life to be valueless.  Not only does the existence of the death penalty indicate that society places an objective value on a particular life, discretionary sentencing, as opposed to mandatory sentencing, is expressly meant "to maintain a link between contemporary community values and the penal system" with regard to the remaining value of the particular defendant's life.

* * *

The subjective rule essentially measures how frequently and adamantly a person expressed the value he placed on his life, rather than how much he actually valued it.  Because the decedent cannot testify as to the value he placed on his life, this evidence would likely come from witnesses who had observed the decedent express his view of how much his life was worth. As a result, it would be easier to prove the subjective value of a braggart's life than the life of a modest person. Regardless of whether Arkansas should measure a life based on how much it was valued by the decedent, accurately doing so is virtually impossible.

*Id*. at 133-35.

The note then discusses the "Minority Approach" characterized as "The Objective,

Statistical Standard."

Another approach for measuring loss-of-life damages is to use an objective value of a statistically average human life.  This approach, generally called "willingness-to-pay," uses economic data to calculate the monetary value that the average person places on his life. Economists generally use four types of data to determine a value for the statistically average life: (1) studies of the labor market, (2) studies of consumer purchasing habits, (3) "the cost/benefit analyses of federally mandated safety projects and programs," and (4) studies of responses to surveys.

All four types of studies used in willingness-to-pay analyses concentrate on choices regarding risks to personal health and safety. First, studies of the labor market, or wage-risk analyses, are the most common source of data for willingness-to-pay studies.  Wage-risk analyses focus on pay raises given in exchange for increased risk of death or injury.  For example, a worker who accepts a one-ten-thousandth increase in his risk of death in exchange for an additional $500 can be said to value his life at $5 million.

Second, the economists who conduct willingness-to-pay studies also use information from the consumer market.  These consumer market analyses are

based on the amount of money consumers are willing to pay for products that
reduce their risk of injury or death.  Using the same type of calculation that is used
for wage risk analyses, economists determine the value of a statistical life based
on the amount that consumers are willing to pay for a particular product and that
product's effect on the consumer's risk of injury or death.

Third, economists analyze the costs and benefits of "federally mandated safety
projects and programs."  Finally, willingness-to-pay analysts use information
collected by surveys, asking respondents to make choices affecting their health
and safety regarding hypothetical situations.  These surveys are less reliable than
the other sources of information, and thus are typically used only when market
information is not available.

*Id.* at 135-36.

The note then deals with the issue of the use of expert witnesses to support that approach

and concludes that none would meet the *Daubert* test. This Court agrees with Ms. Brady's

*Daubert* analysis.  In particular, the Court agrees that the expert opinions offered could not be

tested because they are "attempting to quantify something which cannot truly be determined:

what is the value of a human life?"  *Id.* at 138 (citing *Estate of Sinthasomphone v. City of*

*Milwaukee,* 878 F. Supp. 147, 152 (E.D. Wis. 1995)).  Stated otherwise, the law does not provide

the standard as to which an expert could apply his/her expertise.   Under such circumstances the

expert becomes the "13th juror."  The Court also notes that such expert testimony by different

experts "using the same methodology come up with drastically different values for the

statistically average life . . .  from as low as $0 to as high as $15 million." *Id.* at 138-39 (internal

quotations omitted).

Ms. Brady concludes that Arkansas should follow the majority approach:

Rather than compensate the decedent either for the value that she would have
placed on her own life or for the value of a statistically average life, Arkansas law
should adopt a measure of loss-of-life damages, that compensates the decedent for
her lost "capacity to carry on and enjoy life's activities in a way she would have

16

done had she lived . . . " This is the measure used in Connecticut, the first state to allow compensation for loss of life.  Connecticut courts have interpreted this to mean that, in many respects, loss-of-life damages are assessed "in the same way as in a nonfatal case involving a total and permanent destruction of capacity to carry on life's activities."  Under this rule, Connecticut courts have upheld damages for loss of life based on evidence relating to the activities and pleasures of life that the decedent previously enjoyed or reasonably could have expected to enjoy in the future. For example, in *Fairbanks v. State,* the Connecticut Supreme Court upheld a verdict of $75,000 for the wrongful death of a housewife, based in part on evidence that the woman had a full and happy home life with her husband and three sons.  In addition, Connecticut courts have allowed jurors to consider the fact that the decedent was a "happy and well-adjusted individual . . ."  Connecticut also allows jurors to consider the activities and pleasures of life that the decedent could reasonably have expected to enjoy in the future, such as future plans to travel, get married, or attend college.

Under this approach, plaintiffs could offer as evidence anything having a tendency to prove the type and quality of life the decedent lived and the activities and enjoyments of life in which she participated and of which she is now deprived, provided that such evidence is not otherwise barred. In *Marcotte v. Timberland/Hampstead School District,* the New Hampshire Supreme Court applied this approach and upheld a trial court decision that allowed into evidence the decedent's computer diary and various photographs depicting the decedent and his belongings because such evidence went "right to the heart of hedonic damages."  The court explained that the diary and the photographs were highly probative of the decedent's creativity and health, and of the activities the decedent enjoyed.  Accordingly, the court admitted into evidence both the diary and photographs of the decedent, his home, and his family, taken throughout his life from the time he was born until his death.

Arkansas could easily adopt this measure for loss of life.  Arkansas law has long recognized recovery for permanently disabling personal injury – what other jurisdictions call "loss of enjoyment of the pursuits and pleasures of life" or "Hedonic damages" -- under the umbrella of damages for future pain and suffering.

*Id*. at 142-44 (footnotes omitted).

The problem with Ms. Brady's analysis is that she assumes that the Arkansas Supreme Court's expressed preference "for an individualized, subjective measure," to wit "the loss of value the decedent would have placed on his or her own life," is inconsistent with the "majority"

17

approach as exemplified by the Connecticut courts' calling for the decedent to be compensated

for  his/her lost "capacity to carry on and enjoy life's activities in a way she would have done had

she lived."  *See Katsetos v.Nolan,* 170 Conn. 637, 657, 368 A.2d 172, 183 (1976).  Of course, if

it is inconsistent, then this federal court would have no alternative but to follow the Arkansas

Supreme Court's purely subjective approach, at least until that Court might be persuaded to

change or modify its ruling in *Durham*.  But, the Court is not convinced that there is any real

inconsistency in the Arkansas and Connecticut approaches.

It is true that Justice Imber in *Durham*, after reviewing cases from other jurisdictions,

concluded:

> Clearly, then, loss-of-life damages and damages for loss of enjoyment of life are
> not the same, through some courts and scholars have used the term "loss of
> enjoyment of life" to mean both.

356 Ark. at 489.

Justice Imber also pointed out that several other states, including Hawaii and New

Mexico, allow recovery for loss-of-life damages, with New Mexico's Supreme Court specifically

holding that "the value of *life itself* is compensable" under an Act allowing for "fair and just"

damages in wrongful death cases brought by a decedent's estate.  *Id*.  It is important to note that

this entire discussion by Justice Imber was in response to appellees' argument in *Durham* that

loss-of-life damages "are the equivalent of, and synonymous with, damages for the loss of the

enjoyment of life, and these types of damages are incurred pre-death and require a period of

conscious life between injury and death."  *Id*. at 487.

The circumstance that the Arkansas Supreme Court held that these two elements are

entirely different in the sense that loss of enjoyment of life damages occur before death where

18

loss-of-life damages start at death, cannot be interpreted as expressing any view on the

parameters of evidence that may be relevant to establish those different claims.  There is nothing

in the opinion that would negate an argument that the same type of evidence might be used to

support both claims.

Indeed, Justice Imber cites the Connecticut case of *Katsetos v. Nolan*, 170 Conn. 637, 368

A.2d 172 (1976), in a footnote to support her statement that some states have used the term loss

of life damages to "mean the loss of the enjoyment of being alive that is incurred at the point of

death forward," noting that the Connecticut Supreme Court held that Plaintiffs were entitled to

"just damages" which "include compensation for the destruction of her capacity to carry on and

enjoy life's activities in a way she would have done had she lived."  Durham, 356 Ark. at 487

n.2.

And Justice Imber's further discussion of the *Katestos* case is important.  She notes that

where injuries result in death one of the elements of damages recoverable is "compensation for

the destruction of her capacity to carry on and *enjoy life's activities* in a way she would have

done *had she lived*." *Id.* at 490.  Justice Imber then identifies the type of evidence relied on by the

Plaintiff in *Katsetos*:

> The defendants in *Katsetos* had appealed as excessive the amount of damages
> awarded for the wrongful death of a mother during childbirth.  In upholding the
> jury award to the estate for the decedent's damages, the Connecticut Supreme
> Court stated:
>
>> There was evidence from which the jury could have found that the
>> decedent was 41 years of age at the time of her death and had a life
>> expectancy of about 32 years.  She was happily married and had
>> four children including the child born on the day of her death.  She
>> was a very happy person and in good health before the delivery of
>> her last child.  She was a dedicated mother and homemaker and

active in many outside activities.  She was a state-licensed
hairdresser and also had experience in office work. In 1962, she
and her husband established a pizza business where she worked
until she temporarily discontinued work because of her pregnancy .
. . The defendants argue that the verdict constitutes an award of an
annuity of at least $20,000 a year and that it is excessive when one
considers that the best indication of a possible salary for the
plaintiff's decedent, if she ever returned to hairdressing, was $125
a week plus tips and that any wages she would have earned in the
pizza business were limited.  The defendants' argument takes into
consideration only an evaluation of the destruction of the
decedent's earning capacity *and gives no consideration to the
award of an amount based on the destruction of the capacity to
carry on life's activities* as well as compensation for pain and
suffering.

*Id.* at 184 (emphasis added).

It is apparent from this quote that the Connecticut Supreme Court recognized "the
destruction of the capacity to carry on life's activities" began at death and went
forward through the duration of the decedent's life expectancy.  This was not an
amount recovered for damages suffered by a wrongful-death beneficiary, but was
an amount awarded for damages suffered by the decedent herself.  Though
covered in the Connecticut statutes as "just damages," these were damages for the
loss of the decedent's life, which, in turn, led to the destruction of her ability to
carry on life's activities.

*Id.* at 490-91.

So, this Court does not read *Durham* as establishing a completely separate, subjective

standard in contrast to Connecticut's approach.  On the contrary, *Durham* suggests many types of

evidence that may properly be admitted and relied upon to establish how to place a value on the

deceased's life.

One other important point in this analysis: In *Durham* the appellant, by reason of the

lower court's grant of partial summary judgment, did not obtain a ruling on appellees' motion in

limine to exclude the testimony of an expert economist witness.  *Id*. at 492-93.  The *Durham*

Court observed:

> Though the appellants do not argue this point on appeal, the appellees have noted
> that the appellants retained an economist to provide expert testimony about loss-
> of-life damages.  This expert testimony was the subject of a motion in limine filed
> by the appellees, requesting the expert testimony be excluded.  However, the trial
> court did not reach the issues of the motion in limine because it granted summary
> judgment on the claim for loss-of-life damages.  In a case decided three decades
> ago by this court, we determined that there is no hard and fast rule to determine
> compensatory damages for non-pecuniary losses:
>
> > No rule has been established and in the nature of things none can
> > be – for determining what compensation should be paid for loss of
> > life, for pain and suffering, for loss or decrease of earning power,
> > for mental anguish accompanied by physical injury, for loss of
> > companionship, and for the various elements entering into damage
> > actions.
>
> *W.E. Clark & Sons, Inc. V. Elliott,* 251 Ark. 853, 857, 475 S.W.2d, 514, 517
> (1972). While we do agree with the appellees that the determination of damages is
> within the purview of the jury, without a trial court ruling or order before us on
> the issue of expert testimony, this issue is not right for consideration.

*Id*. at 492-93.

The Plaintiffs did not offer the testimony of any expert witness in support of the

decedent's loss-of-life claim here.

So, what do we know from the evidence in this case which will assist the Court, as the

trier of fact, in arriving at a fair value for the loss of Garret's life?  Naturally this child never

made any statements purporting to indicate directly how he would value his own life.  But, his

short life provides some important indicators.

While the Court does not agree with Plaintiff's expert that, but for the medical

malpractice case, Garret would have lived an average life expectancy (stated as 75 years), it does

find that more likely than not he would have lived as long as fifty years despite his serious medical problems and the risks attendant thereto.  The Court feels more confident in this finding because of the care and concern his parents had for his well-being while he lived and the Court's certainty that they would have continued that care throughout Garret's life.

Garret's parents were not only attentive to his needs; they provided a protective, supportive and loving home.  And he clearly had hands-on regular support from his extended family, including his grandparents.  His family was a source of joy and happiness to Garret and he was a source of joy and happiness to them.  Despite his medical problems, he was a happy and responsive child.

The Court believes it is reasonable to find, and does so find, that Garret's family would have been attentive to his educational development, providing him with the full opportunity to express and utilize his natural talents and abilities.  As a consequence, he could look forward to employment opportunities and the joy of being a productive member of society.  And, he was also likely to experience the joys of married life and parenthood.

Certainly Garret would have considered his life most valuable.  And the prospects were that his life would be valuable to others and to society in general.

Recognizing the difficulty in measuring the immeasurable, the Court finds and concludes that Dawn McMullin, as special representative of the estate of Garret Lee McMullin, is entitled to an award for loss-of-life damages for the death of Garret in the amount of $600,000.00.

**Damages for Wrongful Death – Past and Future Mental Anguish**

The past and future mental anguish suffered, and to be suffered, by Brian and Dawn McMullin is difficult to state adequately in dollars as the Court must.  One thing is apparent:

22

Their grief and anguish is real; it is great; and it was tangibly felt by those observing their testimony during the trial.  The evidence detailed their love of, and devotion to, Garret; their fear and apprehension as his condition deteriorated; their helplessness as they struggled for answers; their sadness and distress a they saw his life slipping away; their resignation when the decision to withdraw life support had to be made in Garret's interest.  And their grief has remained long after his death and clearly will continue long into the future.

After reviewing all of the evidence the Court finds that the parents should receive the following sums to compensate them for their past and future mental anguish:

Dawn McMullin        $900,000.00

Brian McMullin        $800,000.00

FOR THE REASONS STATED, IT IS THEREFORE ORDERED that Defendant is liable to Plaintiffs for the amounts stated above.

Dated this 19th day of October, 2007.


/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE